UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

RACHEL M. EVANS                          )
                                         )
        Plaintiff,                       )
                                         )
        v.                               )        Case No. 3:10-CV-0432-JD
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social                   )
Security,                                )
                                         )
        Defendant.                       )

## OPINION AND ORDER

On October 18, 2010, Plaintiff, Rachel M. Evans ("Evans"), filed her complaint seeking

review of the final decision of the Defendant, Commissioner of Social Security

("Commissioner"). [DE 1].  With the opening brief [DE 14], response brief [DE 16], and reply

brief [DE 17] filed, this matter is now ripe for the Court to rule.

## I.  Procedural History

On September 21, 2007, Evans filed applications for Title II Disability Insurance

Benefits ("DIB") and Title XVI Social Security Income ("SSI"),[1] alleging disability due to panic

attacks and anxiety, with an onset date of February 10, 2007. (Tr. 14, 185). 42 U.S.C. §§ 423,

1382.  Evans' applications were denied initially and upon reconsideration. (Tr. 104-12, 115-28).

Thereafter, Evans requested a hearing (Tr. 129); and, on October 5, 2009, Evans appeared with

counsel before Administrative Law Judge Terry L. Miller ("ALJ"). (Tr. 29).  During the hearing,

---

[1]The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 401.1501 *et seq.*, while the SSI regulations are set forth at 20 C.F.R. § 416.901 *et seq.*  Because the definition of disability and the applicable five-step process of evaluation are identical for both DIB and SSI in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

Evans testified on her own behalf (Tr. 34-77), as did her husband James Evans (Tr. 77-81) and Vocational Expert Loenard Fisher, Ph.D. ("VE") (Tr. 81-99).

On November 12, 2009, the ALJ issued a decision that Evans was not disabled under the Social Security Act, and concluded that although Evans was unable to perform her past relevant work, she retained the Residual Functional Capacity ("RFC")[2] to perform other work that existed in significant numbers in the national economy. (Tr. 14-24).

On July 23, 2010, the Appeals Council denied Evans' request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3). On October 18, 2010, Evans filed her complaint in this Court, pursuant to 42 U.S.C. § 405(g), seeking review of the Commissioner's final decision. [DE 1].

## II. Facts

Evans was thirty-two years old at the time of the hearing and the ALJ's decision. (Tr. 35, 163). Evans has the equivalency of a high school education and has past relevant work experience as a certified nursing aid, a conveyer feeder, and a packer at a factory (all generally medium work per the Dictionary of Occupational Titles). (Tr. 23, 87, 189). Evans alleged a disability onset date of February 10, 2007. (Tr. 14, 185). Following her alleged onset date, Evans has not performed substantial gainful activity. (Tr. 178-80, 185). Evans met the insured status requirements through March 31, 2012. (Tr. 16, 178).

## A.    Medical Records

Sometime in 2000 and 2001, Evans was involved in a vehicular accident and she suffered the loss of her infant child. Since this time, Evans has suffered from emotional and physical

---

[2]Residual Functioning Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545(a)(1).

problems as documented below.

On June 9, 2003, Evans went to the clinic and was seen by Family Nurse Practitioner Cindy Fritz. (Tr. 325-26). Evans indicated that she was in a car accident one and a half years prior and hurt her back, and she was still experiencing low back pain and wanted medication for her nerves. Evans admitted that she never followed up on her injury, but she thought that she could just deal with the pain. Fritz noted that Evans was nonspecific about the pain, and reported Evans as having a full range of motion in her cervical spine. Lumbar x-rays were ordered and she was given a prescription for Klonopin.

On July 10, 2003, Evans followed up with Dr. John Rogers, M.D., and reported that the Klonopin did not seem to be helping her, that she was having increased stress at work and at home, and she was having trouble sleeping. (Tr. 324). Dr. Rogers noted that she had a flat affect, with inappropriate smiling at times. Her prescription for Klonopin was increased.

Records from January and February 2004 indicate that she needed her medication refilled for her diagnosed anxiety. (Tr. 318-19).

On November 13, 2006, Evans sought help from Dr. Zeba Ali for her anxiety. (Tr. 256-59). Evans reported that she gets easily stressed, her heart races and she gets sweaty palms, and it occurs when she is in public or while driving. *Id*. Dr. Ali determined that Evans suffered from panic attacks and social anxiety disorder. (Tr. 259). In turn, Dr. Ali prescribed her Xanax, Zoloft, and Wellbutren to help alleviate her symptoms. (Tr. 259).

On January 8, 2007, Evans filled out forms at a checkup and reported that she did not suffer from severe headaches, pain in her legs, chest, abdomen, or joints, that she did not have trouble falling asleep, and that in the last month she did not experience feeling down, depressed,

hopeless or a lack of interest to do things. (Tr. 251).  She also indicated that for exercise she walks at a heavy exertion level. *Id.*

Yet, the next month, on February 27, 2007 (shortly after the alleged onset date), Evans complained of left knee pain to Dr. Ali. (Tr. 245). Evans stated that she had difficulty walking up the stairs. (Tr. 239).  Dr. Ali noted that there was some grinding in Evans' left knee and issued a prescription for Relafen. (Tr. 239). Despite the grinding, Dr. Ali diagnosed Evans' range of motion as within normal limits. (Tr. 239).

On September 27, 2007, Evans saw Dr. Ali for a followup on her left knee pain, reporting that her left knee hurts when walking up stairs, but her right knee is fine. (Tr. 239).  Dr. Ali indicated that the left knee had positive grinding on flexion and extension, but the range of motion was within normal limits, so he ordered an x-ray and instructed her to lose weight. *Id.*

On December 18, 2007, Evans underwent a consultative psychological examination at the request of the Indiana Disability Determination Bureau. (Tr. 262).  Evans was observed by licensed clinical psychologist Nancy H. Link, Psy.D., H.S.P.P. (Tr. 262-66).  Evans reported that she suffers from panic attacks, and shortness of breath, her neck twitches, her heart pounds, and she gets shaky and sweaty, all of which affects her concentration and she tries to avoid people. *Id.* Evans indicated that the symptoms began in 2000 when she lost a child, and in 2001 they became worse after she had a car accident. *Id.*  She denied suicidal and homicidal ideation and intent. *Id.* Dr. Link diagnosed Evans with panic disorder with agoraphobia, noted Evans' fear of social interaction, determined that Evans was "moderately impaired in terms of work related activities in respect to her overall level of functioning," and assigned Evans a Global Assessment

of Functioning ("GAF") score of 60.[3] (Tr. 266).

On December 26, 2007, Nurse Practitioner Brenda Winski reported that Evans came to see her as a primary health care provider. (Tr. 291-92). Evans complained of shortness of breath, fear and worry, sweatiness, and occasional fluttering of her chest, which all affected her driving. Evans reported that other prescriptions made her sick, so she took Xanax which helped her the most but made her feel a bit groggy. Evans denied feeling depressed, having a change in her memory, feeling suicidal, weak, or fatigued, denied headaches, lightheadedness, or dizziness, and denied pain in her chest. Winski reported that Evans had a positive affect and interacted well, and ambulated with a smooth coordinated gait. Evans was prescribed Librium.

On January 3, 2008, a non-examining state agency physician, Dr. Joelle Larsen, Ph.D., completed a mental RFC assessment and psychiatric review technique form. (Tr 267-84). Dr. Larsen indicated that relative to understanding and memory, Evans was not significantly limited in her ability to remember locations and work-like procedures or to understand and remember very short and simple instructions, but that she was moderately limited in her ability to understand and remember detailed instructions; relative to sustained concentration and persistence, she was moderately limited in her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, and her ability to work in

_____

[3]A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS-Text Revision 32 (4th ed. 2000). The higher the GAF score, the better the individual's psychological, social, and occupational functioning. A GAF score of 51-60 indicates moderate symptoms, such as flat affect and circumstantial speech, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning, such as few friends or conflicts with peers or co-workers. A GAF score of 61-70 indicates some mild symptoms, such as depressed mood and mild insomnia, or some difficulty in social occupations, or school functioning, such as occasional truancy, or theft within the household, but generally functioning pretty well, has some meaningful interpersonal relationships.

coordination with or proximity to others without being distracted by them; relative to social interaction, she was moderately limited with her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors; and, she was not significantly limited in any respect relative to her ability to adapt. Dr. Larsen noted that despite Evans' fear of driving, she does drive, uses public transportation, and receives rides from others. Dr. Larsen also reported that on a daily basis, Evans takes care of her personal hygiene, cares for her daughter, and performs household chores, and she noted that Evans shops in stores for necessities for about an hour each week and follows instructions but may need to be reminded when instructions are given orally. Evans' attention and concentration were poor, but she completed all tasks and performed simple calculations within normal limits. Dr. Larsen opined that Evans may have difficulty interacting in social places, would benefit from a job independent from crowds, and retained the ability to perform simple repetitive tasks on an extended basis without special consideration. Dr. Larsen diagnosed Evans with panic disorder with agoraphobia, and found Evans to have: mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation; and, Dr. Larsen found that no evidence established the presence of C criterion of any listed impairments enumerated in the Listing of Impairments found in 20 C.F.R. pt. 404, Subpt. P, Appendix 1 (referred to as Listings).

On January 16, 2008, Winski diagnosed Evans with general anxiety disorder and social phobia. (Tr. 286-88, 297). At the time, Evans complained of panic attacks and left knee pain. Evans reported having a panic attack while driving to the appointment, but denied any

headaches, dizziness, or lightheadedness, or feeling faint or weak. On physical exam, Evans had a full range of motion in all of her joints without tenderness, and her muscle strength was equal bilaterally. After ordering an x-ray of her left knee, Winski noted that it came back negative. Evans was prescribed Xanax for her anxiety and instructed to lose weight.

On January 29, 2008, Evans began seeing therapist Bennett Nott of Good Samaritan Counseling Center. (Tr. 331-40). Evans reported taking several medications for her depression, anxiety, panic attacks, irregular heart beat, and left knee pain, and she reported that she was seeking counseling for her anxiety, panic attacks, depression, social phobia, worry, and stress. Mr. Nott diagnosed her with anxiety attacks, social isolation, insomnia, and repressed mood. Evans was seen by Mr. Nott through March 25, 2008, for her mental impairments. (Tr. 341-52). In February, Mr. Nott reported that Evans had low energy, and by the end of Evans' treatment with him, Mr. Nott produced a report diagnosing Evans with major depression, panic disorder, and agoraphobia. (Tr. 345-52). Mr. Nott assigned Evans a GAF score of 45,[4] and noted that Evans' memory was "poor," her ability to attend to a simple work routine on a consistent basis was "very poor," and he described Evans' stress tolerance as very poor with anxiety, confusion, and withdrawal. (Tr. 345, 347, 350). Evans discontinued therapy with Mr. Nott due to financial issues, but returned to his care in June 2009. (Tr. 366, 400).

On March 28, 2008, Dr. M. Brill, M.D., reviewed Evans file on behalf of the state agency and reported that Evans notes an irregular heart beat, but her exam from January 2008 indicates that she suffers only from psychological symptoms. (Tr. 343). Dr. Brill's review resulted in his

---

[4]A GAF score of 41-50 indicates serious symptoms, such as suicidal ideation, severe obsessional rituals, frequent shoplifting, or any serious impairment in social, occupational, or school functioning, such as no friends or unable to keep a job.

conclusion that Evans did not suffer from any severe impairments. *Id.*

On April 23, 2008, state agent Dr. Kenneth Neville, Ph.D., reviewed Evans file and also affirmed the January 3, 2008 assessment as written.

On May 21, 2008, Evans saw Winski for a followup on her anxiety and panic attacks, and it was noted that she was taking Tramadol, BuSpar, Propranolol, and Xanax, which were providing her some relief. (Tr. 363-64). Evans indicated that her attacks were worse when she is in crowds and driving, but were otherwise minimal at home. Upon exam, Evans complained of some left knee pain, but had a full range of motion in all of her joints without tenderness and her muscle strength was equal bilaterally. Evans was diagnosed with an abscess to her upper left thigh, social phobia anxiety, and left knee pain. Her prescriptions were refilled.

On August 28, 2008, Evans saw Dr. Malek Maatouck, M.D., to establish care with a new primary care physician (Tr. 360-61). Evans reported that she was just in a car accident on August 15, 2008 and went to LaPorte Hospital for x-rays where she was told that she had soft tissue injuries. Evans complained of neck and back pain which rated a 7 on a scale to 10, however, Dr. Maatouck noted that her strength was 5 out of 5 in all extremities, and that he did not believe that she was in such pain because she moved normally and was not in any distress. Evans was diagnosed with anxiety disorder and social phobia, but she was advised that she needed to see a psychiatrist to receive further Xanax.

On September 25, 2008, Evans reported to Dr. Kelly that she was in a car accident where she hurt her mid and low back, and she suffered whiplash to her neck. (Tr. 391). Dr. Kelly diagnosed Evans with Fibromyalgia, and documented pain in 11 of 18 trigger points, without further findings or explanation.

On December 4, 2008, Evans saw Dr. Vinay C. Tumuluri, M.D., as a new patient. (Tr. 379-80). Evans said she was concerned about her high cholesterol, and she reported having anxiety and neck pain that is reasonably controlled. Dr. Tumuluri would not give her a prescription for Flexeril, but gave her Darvocet, as needed, and told her that she would be referred to a pain specialist if she continued to have a need for pain medication. He continued her on Xanax for her anxiety.

On May 7, 2009, Dr. Tumuluri noted that Evans came to see him for a followup, but she had a "very odd affect," and refused medications for her anxiety, except for Xanax, because they did not work for her. (Tr. 372). And on August 11, 2009, Dr. Tumuluri noted that Evans had the flu, anxiety, B-12 deficiency, and dyslipidemia.

On June 2, 2009, Mr. Nott noted that Evans had a car accident in August 2008 and she re-counted these events, and he noted that she continued to have anxiety, depression, and agoraphobia. (Tr. 400-01). On July 7, 2009, Evans reported having anxiety when she drives, which became worse with her August 2008 accident, and Mr. Nott noted that Evans was verbal, soft-spoken, mildly anxious, and maintained fair eye contact. (Tr. 399). On July 14, 2009, Mr. Nott wrote a letter to attorney Gary D. Davis (who represented Evans at her hearing before the ALJ) stating that he believed Evans continued to struggle with chronic pain and bouts of depression and anxiety with agoraphobia, which limited her capacity to function on a daily basis. (Tr. 366). He noted her August 2008 accident resulted in her having additional difficulties, and he reported that Evans was recently diagnosed with Fibromyalgia. *Id*. On July 21, 2009, Mr. Nott noted that Evans was keeping a notebook of her anxiety and she was mildly anxious. (Tr. 398).

On August 27, 2009, Evans was seen by Dr. Prasad Babu for anxiety attacks and depression. (Tr. 393). Dr. Babu diagnosed Evans with generalized anxiety disorder and social phobia. Dr. Babu instructed Evans to seek individual therapy and increased her Xanax dosage.

In September 2009, Evans reported that her anxiety was worse since her aunt died, and Mr. Nott noted that she was focused on her anxiety again. (Tr. 395-97). On September 8, 2009, Mr. Nott completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" for Evans, and indicated that she suffered from agoraphobia, anxiety attacks, and depressed mood. (Tr. 403-05). He reported that Evans' ability to make occupational adjustments and performance adjustments were "poor/none," except that she ranked "fair" at being able to follow rules, use judgment, and understand, remember, and carry out simple job instructions. Similarly, Mr. Nott indicated that Evans' ability to make personal-social adjustments were "poor/none," except that she could "fair[ly]" maintain personal appearance. He rated Evans as having an "extreme loss" for the ability to do the following work-related activities: make simple work-related decisions, respond appropriately to usual work situations, deal with changes in a routine work setting, and respond appropriately to supervisors and co-workers. Mr. Nott believed that Evans mental symptoms would result in her failure to complete tasks in a timely manner for one or more hours of an eight hour workday on a chronic basis, that Evans would be forced to miss four or more days of work per month, and that Evans was not capable of sustaining competitive work on a regular and continued basis. On October 6, 2009, Mr. Nott wrote another letter to attorney Gary Davis indicating his belief that Evans presented symptoms of Post-Traumatic Stress Disorder. (Tr. 415).

In October 2009, Evans was examined by physical therapist, Robert Lee, who completed

a "Medical Assessment of Ability to do Work-Related Activities (Physical)" for Evans (Tr. 409-13).  Mr. Lee opined that Evans could lift and/or carry 10 pounds occasionally, lift and/or carry less than 10 pounds frequently, could stand/walk at least 2 hours in an 8 hour workday, could sit about 6 hours in an 8 hour workday, and noted that she was limited in her upper and lower extremities in her ability to push and/or pull due to pain.  Mr. Lee opined that Evans could never balance, crouch, or stoop, she could occasionally climb (ramps/stairs/ladders/ropes/scaffolds), kneel, and crawl.  He noted that Evans had limited dexterity and was limited in her ability to reach due to pain in her shoulders and upper back, and therefore, he found that she was limited in her ability to reach in all directions, handle (gross manipulation), and use her fingers (fine manipulation), but she was unlimited in her ability to feel.

## B.     Evans' Testimony

On October 5, 2009, Evans appeared with counsel and testified at a hearing before the ALJ. (Tr. 29-77).  Evans indicated that almost all of the time while driving she gets anxiety and panic attacks, she sweats, and her neck jerks. (Tr. 37-38). She testified that the last job she had was working at Dairy Queen where she stopped working after a week because she could not memorize the keyboard for the drive through. (Tr. 41).

When describing her physical limitations, Evans testified that she frequently experiences achiness and sharp pains in her neck, knees, and back as a result of her Fibromyalgia. (Tr. 43-45, 48).  Evans was not presently taking medicine or seeing a doctor for her Fibromyalgia. (Tr. 46-47).  Evans also testified that she has arthritis in her knees, that she has problems with her lower and upper back and "a third lumbar is touching a nerve," and she could only walk for a quarter of a mile before she starts hurting. (Tr. 43, 52-53).  Evans was presently taking medicine for her

pain and seeing a chiropractor. (Tr. 49-50). Furthermore, Evans indicated that she could only stand for about half an hour before her knees, neck, and back bothered her. (Tr. 53). Evans testified that she could only rest in a sitting position for forty minutes, otherwise she would experience discomfort. (Tr. 53). Evans stated that she could lift 10 pounds or less occasionally, that she experienced pain in her neck and back when reaching and bending, and that climbing up or down her stairs bothered her knees. (Tr. 53-56). Evans stated that her hands shake, which she demonstrated, and that her hands would cramp up if she had to use a computer keyboard. (Tr. 54-55, 76).

During the hearing, Evans noted that she sought treatment for her mental disorders, that she was diagnosed with anxiety, panic attacks, depression, and social phobia, and that she took Xanax for her issues which was helpful. (Tr. 44, 56-57). Evans described her panic attacks as involving sweating, breathing difficulties, and clenching of the hands, and she indicated that the attacks occur two to three times a week and normally when she is stressed or in public. (Tr. 58-59). Evans indicated that her depression causes her to have a poor appetite and she cries without provocation two to three times a week. (Tr. 59). When questioned about her ability to complete tasks at home, Evans responded that her mental and physical problems keep her from completing household tasks, like vacuuming and washing dishes. (Tr. 60-65).

Despite her limitations, Evans testified that she regularly takes her daughter to school and speech therapy and prepares meals for her, and Evans stated that she visits with her family. (Tr. 61-64). Evans indicated that she had difficulty remembering things and that she must write everything down or it will be forgotten. (Tr. 69). Evans stated that she needs help grocery shopping and that she only shops late at night when there are less people. (Tr. 68-69). Evans

reported having difficulty with doing the laundry which required assistance to get to the basement. (Tr. 69-70). Lastly, Evans indicated that since the death of her child in 2000, Evans is slower to respond to questions, she has difficulty maintaining a pace, and her memory and ability to comprehend have diminished. (Tr. 74-76).

### C.      Evans' Husband's Testimony

James Evans ("Mr. Evans"), husband of the claimant, also testified at the hearing before the ALJ. (Tr. 77-81).  Mr. Evans indicated that he and Evans have been married ten years but have been separated for a few months. (Tr. 77-78).  Mr. Evans testified that he remembered when Evans was able to work and function well, but now Evans has difficulty being in public and thus they stopped going out. (Tr. 78, 80).  Mr. Evans stated that Evans keeps to herself, does not go out, and does not have any friends. (Tr. 80).  He recounted his losing his job after Evans lost her child, because she would call him at work often and he would have to leave work to be with her because she was frantic and crying. (Tr. 79).

Mr. Evans testified that Evans gets very nervous behind the wheel, drives really slow, has emotional outbursts, and fears other cars. (Tr. 80-81). Mr. Evans stated that she portrays the same behavior when she is the passenger. (Tr. 81).

### D.      Vocational Expert's Testimony

During the hearing, the ALJ asked the VE to first consider a hypothetical individual of Evans' age and past work experience, who had no exertional limitations, but had the following mental work related limitations: could only perform unskilled work and simple, routine tasks during an eight hour day with the usual and normal work breaks; flexible work pace and no fast pace or strict production requirements; no work with the general public and only brief, routine

interactions with supervisors and co-workers, which would work best if she were alone or in a small group.[5] (Tr. 87-88).

In response, the VE testified that such an individual could not perform Evans' past work because "you have to move along." (Tr. 88). However, the VE noted that the same individual could perform medium, unskilled jobs such as dining room attendant, industrial cleaner, and dishwasher, which existed in significant numbers in the economy. (Tr. 88).

Second, the ALJ asked the VE to reduce the hypothetical to light work only (lift, carry, push, and pull twenty pounds occasionally, ten pounds frequently; sit, stand, and walk up to six hours for each activity), with the following additional limitations: occasional climbing of ramps and stairs; occasional kneeling, balancing, stooping, or crouching; occasional overhead work; and limited to frequent (as opposed to constant) handling and fingering with the hands. (Tr. 89).

In response, the VE testified that this hypothetical individual would be able to perform light work such as that of a cleaning worker/housekeeper, mail clerk, and electronics worker, which existed in significant numbers in the economy. (Tr. 90).

Third, the ALJ asked the VE to further reduce the hypothetical to sedentary work (lifting, carrying, pushing, and pulling only up to 10 pounds, and sitting 6 of 8 hours while standing/walking the other 2 hours) (Tr. 90). The VE stated that an individual with the listed limitations could perform sedentary work as a document preparer, surveillance monitor, or taper, which existed in significant numbers in the economy. (Tr. 90-91).

---

[5]The limitations posed in this hypothetical to the VE was ultimately identical to the ALJ's RFC assessment: Evans has the RFC to perform "a full range of work at all exertional levels but with the following nonexertional limitations . . . unskilled work where the individual can sustain simple routine tasks during an eight hour workday with the usual and normal work breaks; she needs a flexible work pace and no fast-paced or strict production requirements; she cannot work with the general public; the claimant can have only brief, routine interactions with supervisors and coworkers; and she would work best alone or in small groups." (Tr. 19).

Fourth, the ALJ asked the VE to consider a completely different hypothetical, which was based on Mr. Nott's findings, involving an individual with the following limitations: cannot complete tasks in a timely manner for one or more hours of an eight hour work day on a regular basis; would be absent four hours, four or more days per month; would have no significant ability to make simple work related decisions, respond appropriately to usual work situations, respond to changes in the routine work setting, and respond appropriately to supervisors and co-workers. (Tr. 91). The VE testified that an individual with the aforementioned limitations would not be able to perform any competitive work. (Tr.91).

The ALJ posed a fifth hypothetical to the VE and asked him to consider, based on Mr. Lee's report, an individual who could perform only sedentary work with only occasional upper extremity handling, fingering, and reaching. (Tr. 91-92). In response, the VE stated that there would be no competitive work that such an individual could perform. (Tr. 92). During cross-examination, the VE noted that the inability to drive and get to work would go to absences, and an employer would generally only allow one absence per month. (Tr. 93-94).

**E.     ALJ's Opinion**

In his opinion dated November 12, 2009, the ALJ determined that Evans met the insured status requirements through March, 31, 2012, and found that Evans had not engaged in substantial gainful activity since February 10, 2007, the alleged onset date. (Tr. 16). The ALJ concluded that Evans had severe impairments consisting of generalized anxiety disorder, panic disorder with agoraphobia, and social phobia, but that her impairments did not, singly or in combination, meet or equal any listed impairment enumerated in the Listings. (Tr. 16-17). The ALJ found that Evans had the RFC to perform a full range of work at all exertional levels but with the following

nonexertional limitations: Evans is limited to unskilled work where she can sustain simple routine tasks during an eight hour workday with the usual and normal work breaks, with a flexible work pace and no fast paced or strict production requirements, no work with the general public and only brief, routine interactions with supervisors and coworkers, and she would work best alone or in small groups. (Tr. 19-23). Ultimately, the ALJ concluded that based on this RFC and the VE's testimony, Evans was unable to perform any past relevant work but she could still perform a significant number of jobs in the national economy, and therefore, she was not disabled. (Tr. 23-24).

### III. Standard of Review

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, the district court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or

substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id.* Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. Analysis

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). If the claimant is performing substantial gainful activity or does not have a severe medically determinable impairment, or a combination of impairments that is severe and meets the duration requirement, then the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(ii). At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a Listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

First, Evans argues that the ALJ erred by improperly assessing her credibility and ignoring the testimony of her husband. Second, Evans asserts that the ALJ improperly weighed the medical source opinions of record which were then relied on to craft the RFC. Third, Evans argues that the ALJ erred in his RFC assessment by failing to account for specific impairments. Fourth, Evans claims that the ALJ erred in his step five determination by presenting incomplete hypotheticals to the VE (which were allegedly based on an erroneous RFC) and by ignoring

relevant parts of the VE's testimony which would suggest that no work in the economy exists that Evans could perform (based on the RFC as determined by the ALJ).

## A.     ALJ's Credibility Determination

Evans argues that the ALJ committed error by discounting her testimony and ignoring the testimony of her husband.  In response, the Commissioner maintains that the ALJ provided more than sufficient reasons for his credibility finding and thus his opinion should be afforded deference.

Because the ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset on appeal so long as it finds some support in the record and is not patently wrong. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).  Indeed, "[o]nly if the trier of facts grounds his credibility finding in an observation or argument that is unreasonable or unsupported can the finding be reversed." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).  However, as a bottom line, SSR 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding. *Golembiewski v. Barnhart*, 322 F.3d 912, 915-17 (7th Cir. 2003).  Further, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible. *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004); SSR 96-7p.

The process for evaluating a claimant's symptoms is organized around two major steps. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms.  20 C.F.R. § 404.1529(a)-(b).  In Evans' case, the ALJ found that her

medically determinable impairments could reasonably be expected to cause some of her alleged symptoms. (Tr. 21).

Second, after the first step is satisfied by the claimant, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. 20 C.F.R. § 404.1529(a).  While an ALJ may not reject subjective complaints of pain solely because they are not fully supported by medical testimony, the ALJ may consider that as probative of the claimant's credibility. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); SSR 96-7p.  The regulations identify seven examples of the kinds of evidence the ALJ considers, in addition to objective medical evidence, when assessing the credibility of an individual's statements:

> (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c); SSR 96-7p.  The ALJ should not mechanically recite findings on each factor, but must give specific reasons for the weight given to the individual's statements. SSR 96-7p.

Reviewing the ALJ's opinion, the Court concludes that the ALJ adequately considered the evidence of record, including Evans' husband's testimony, and gave specific reasons for the weight he gave to Evans' statements.  The ALJ noted that Evans testified that she was just as disabled by her physical problems as she was by her mental impairments, and that she suffers

from pain in her back, arthritis pain in her knees, neck and shoulder problems, and muscle and joint pain from Fibromyalgia. The ALJ noted that she described the pain in her neck, knees, and back as a sharp pain, while her knees ache and pop. The ALJ then summarized Evans' own description of her limitations, including the fact that she can only sit for 30-40 minutes but then she gets up and moves around to alleviate her low back pain. Relative to her symptoms of anxiety, the ALJ recounted that going out in public or being around people increases Evans' symptoms, and she has 2-3 panic attacks and cries 2-3 times a week. As he is required to do, the ALJ also considered and recounted the testimony given by Mr. Evans. Specifically, the ALJ noted in his opinion that Mr. Evans and his wife have been separated for a few months, that Evans is much worse now and cries more, that he lost a job because she called him so much, that she no longer wanted to be around people, that she stays by herself, and that she has difficulty being in a car even when she is not driving.

The ALJ then identified the evidence of record that called Evans' credibility into question, including the following: no physical examinations nor image studies supported the extent of her limitations and pain; her treatment for pain was not consistent or regular; after the 2001 vehicular accident she was able to work at substantial gainful activity for several years; even after the August 2008 accident, examining doctors were doubtful that she was in as much pain as alleged; x-rays have shown no abnormalities of the skeleton; and although she was diagnosed with fibromyalgia, the reference contained no accompanying description of clinical findings concerning the location of the trigger points, nor was there a discussion about other causes of pain; the extent of her daily activities, which showed her ability to drive when necessary, independently care for herself and her daughter, go grocery shopping, and visit with her family;

the opinions of the state agent physicians which indicated that none of Evans' physical impairments were severe, and the contradicting opinion of the physical therapist, Mr. Lee, whose opinion was ultimately afforded no weight.[6] The ALJ also considered and summarized the findings made by Mr. Nott, Dr. Larsen, Dr. Link, and Dr. Babu, relative to Evans' anxiety and mental limitations, and explained the weight he afforded those findings.[7]

Further, in determining that Evans' statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible, the ALJ noted that she takes Darvocet for her pain, but only went to a physical therapist once to have papers filled out for her disability claim. He noted that she takes Xanax for her anxiety and has seen a counselor which has helped, but he also recognized that she did not receive treatment until February 2007, that no medical evidence documented her deterioration thereafter, and that she has never received intensive mental health treatment. The ALJ noted that Evans' physical and mental health did not keep her from working several years after the traumatic events that she suffered with the 2000 and 2001 loss of her daughter and car accident.

Thus, after stating that the claimant was not credible, the ALJ in this case adequately supported his finding with evidence from the record, by specifically discussing her daily activities; the location and frequency of her pain and the frequency of her anxiety; factors that seemed to aggravate or alleviate her symptoms; the medication and other treatment that she has received; the testimony of her husband; the objective medical evidence; and, the information provided by the physicians, the psychologist, the therapists, and the psychiatrists. Thus, the ALJ

---

[6] *See infra* at 23-34 for the Court's discussion regarding whether the weight afforded medical sources was supported by substantial evidence.

[7] *See id.*

complied with 20 C.F.R. § 404.1529(c) and SSR 96-7p, and gave specific reasons for the weight

that he gave to Evans' statements. Given the ALJ's discussion, the Court finds that the ALJ's

determination of Evans' credibility was not "unreasonable or unsupported," *Prochaska*, 454 F.3d

at 738, and was not "patently wrong." *Herron*, 19 F.3d at 335. Accordingly, the ALJ did not

error in making his determination that Evans' statements concerning the intensity, persistence and

limiting effects of her symptoms were not credible.

**B.      Weight Afforded to Medical Sources**

Evans asserts that the ALJ gave inappropriate weight to the medical source opinions of

record, by discounting the opinions of therapist Mr. Nott and physical therapist Mr. Lee, and by

giving weight to the opinions of the examining state agency licensed psychologist Dr. Link and

the reviewing state agency psychiatrist Dr. Larsen. Evans believes that the ALJ confused the

report of Dr. Link with the conclusions reached by Dr. Larsen.

In response, the Commissioner maintains that the ALJ properly considered Mr. Nott's

opinion and explained why it was not entitled to much weight; and, the ALJ properly noted the

opinion of Mr. Lee and explained why his opinion was also entitled to little or no weight. The

Commissioner asserts that the ALJ properly gave significant weight to the state agent psychiatrist

and psychologist opinions because they were well-supported by the record, and the Commissioner

argues that the ALJ did not conflate Dr. Link's report with Dr. Larsen's file review, but correctly

accredited Dr. Link with the relevant GAF score assignment and Dr. Larsen with the subsequent

supporting report.

Before evaluating whether the ALJ properly weighed the conclusions of the medical

sources, the Court must first determine what type of  "medical sources" the individuals are

considered. Consistent with 20 C.F.R. § 404.1502, the following terms have the following definitions, in relevant part: "medical sources" refers to acceptable medical sources, or other health care providers who are not acceptable medical sources; "acceptable medical source" refers to one of the sources described in § 404.1513(a), which in relevant part includes licensed physicians and licensed or certified psychologists, who provides evidence about a claimant's impairments (whether a treating, non-treating, or non-examining source); and "treating source" means a claimant's own physician, psychologist, or other acceptable medical source who provides, or has provided, the claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant. *See* 20 C.F.R. § 404.1502. In addition, "other sources" includes, but is not limited to, the following:

> (1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
> (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
> (3) Public and private social welfare agency personnel; and
> (4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. § 404.1513(d).

The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is important because evidence from acceptable medical sources is necessary to establish the existence of a medically determinable impairment, only acceptable medical sources can give medical opinions, and only acceptable medical sources can be considered treating sources, whose medical opinions may be entitled to controlling weight under 20 C.F.R. § 404.1527(d). SSR 06-03p. However "information from such 'other sources'

may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p.

Both acceptable medical sources and other sources are to be evaluated under the factors in 20 C.F.R.§ 404.1527(d). SSR 06-03p. Therefore, unless given controlling weight as a treating source, the factors to be considered in deciding the weight to be given any medical source are the length, frequency, and nature of the treatment, the consistency of the source's opinion with the other evidence, the degree to which the source presents relevant evidence to support the opinion, whether the source specializes in an area related to the individual's impairment, and any other factors tending to support or refute the opinion. 20 C.F.R.§ 404.1527(d); SSR 06-03p.

*Mr. Nott and Mr. Lee's Opinions*

Evans asserts that the ALJ inappropriately dismissed Mr. Nott and Mr. Lee's opinions, despite Mr. Nott's treatment history of Evans and despite Mr. Lee's having met Evans on one occasion. The Court does not find Evans' arguments persuasive.

Based on the regulatory definitions, therapists Mr. Nott and Mr. Lee are not considered "acceptable medical sources." In any event, these therapists may provide insight into the severity of Evans' impairments and how they affect her ability to function, and therefore the ALJ is required to consider the opinions and explain the basis for the weight afforded the opinions. *See id.*; *Sullivan v. Astrue*, No. 10-C-8132, – F.Supp.2d–, 2011 WL 5301785 *11 (N.D. Ill. Nov. 3, 2011).

Evans is correct that examining sources are generally entitled to greater weight, *see* 20 C.F.R. § 404.1527(d)(1); however, the ALJ was entitled to give Mr. Lee and Mr. Nott's opinions less weight if he adequately explained his reasons for doing so.

In this case, after the ALJ determined that Evans did not suffer from any severe physical impairments, the ALJ considered the assessment of physical therapist Mr. Lee. Mr. Lee essentially reduced Evans' ability to a sedentary level, but the ALJ then gave the opinion "no weight." (Tr. 21). In doing so, the ALJ noted that Mr. Lee was a physical therapist who was not a licensed doctor or an acceptable medical source, that Mr. Lee only examined Evans on one occasion, that Mr. Lee was not a treating source and had no longitudinal knowledge of Evans, that Mr. Lee failed to identify any clinical evidence that supported his opinion, and that Mr. Lee gave an opinion which was inconsistent with other record evidence, including the state agency physicians' opinions. Based on this ample explanation for according Mr. Lee's opinion no weight, which included a discussion of the factors under 20 C.F.R. § 404.1527(d), the Court finds that the ALJ gave a sufficient basis for rejecting Mr. Lee's opinion.

After finding that Evans suffered from severe impairments of generalized anxiety disorder, panic disorder with agoraphobia, and social phobia, the ALJ explicitly acknowledged that he "considered the opinion offered by Ben Nott," which the ALJ then discounted. (Tr. 22). The ALJ noted that Mr. Nott treated Evans from January through March 2008, and due to financial limitations she did not return to his treatment until June 2009;[8] and, the ALJ noted that Mr. Nott found Evans to have poor to no ability to handle almost all areas of work-related functioning and otherwise extreme functional limits.[9] However, the ALJ disagreed with Mr.

---

[8]Consistent with SSR 96-7p the ALJ considered Evans' explanation for why she stopped treatment with Mr. Nott prior to drawing conclusions about Evans' symptoms and their functional effects.

[9]While it is true that the ALJ did not specifically mention Mr. Nott's GAF rating of 45, the ALJ is not required to specifically mention each piece of evidence. *Terry*, 580 F.3d at 475. In any event, the ALJ's characterization of Mr. Nott's opinion as endorsing Evans' having extreme functional limitations would incorporate such a low GAF finding. Further, it is clear that the ALJ did indeed consider the Mr. Nott's opinion it its entirety, but determined to discount the opinion based on the reasons set forth herein.

Nott's opinion to the extent that it did not support his RFC finding because although Mr. Nott was a treating therapist, he was not a licensed psychologist, medical doctor, or an otherwise acceptable medical source. In addition, the ALJ explained that Mr. Nott's own treatment notes did not document the extreme limitations that Mr. Nott later reported her to have, but instead Mr. Nott's records revealed that Evans was mildly anxious, verbal, and she made good eye contact.

Not only were Mr. Nott's treatment notes inconsistent with the extreme limitations that he later found Evans to have, but the ALJ explained that the findings made by Dr. Link and Dr. Larsen were also inconsistent with Mr. Nott's opinion—which was another reason to discount Mr. Nott's opinion. In doing so, the ALJ did not confuse Dr. Larsen's conclusion that Evans had some limitations with social function, needed to avoid crowds, but could do simple repetitive tasks, with Dr. Link's conclusions that Evans was moderately impaired in terms of her work-related activities. The ALJ even identified Dr. Link as the examining consultative psychologist, with a psychology degree (making her an acceptable medical source), and thus, explicitly gave Dr. Link's findings, including her GAF determination, greater weight than he gave Mr. Nott's opinion. The ALJ also considered psychiatrist Dr. Babu's August 2009 diagnosis of generalized anxiety disorder and social phobia, but noted that Dr. Babu did not give Evans a GAF rating or otherwise assess her level of functioning, and therefore, his records did not add much to the ALJ's determination.

Consistent with 20 C.F.R. § 404.1527(d), the ALJ gave more than a sufficient explanation for how he resolved to dismiss Mr. Nott's opinion. It is not the job of this Court to reweigh the evidence, instead, it is the duty of this Court to make sure the decision of the ALJ has sufficient

support. *See Lopez ex rel. Lopez,* 336 F.3d at 539. Accordingly, the Court finds that the ALJ's decision to reject Mr. Nott's opinion was sufficiently articulated and supported by the evidence.

*State Agent Opinions*

Relative to the weight that the ALJ gave to Dr. Link's opinion and to the non-examining opinions of the reviewing state agents, Drs. Larsen, Brill, and Neville, the Court reiterates that the ALJ has a duty to evaluate acceptable medical sources and other sources, and decide the weight to be given to each source. 20 C.F.R.§ 404.1527(d); SSR 06-03p. As previously discussed, the ALJ discredited the opinions of Mr. Lee and Mr. Nott, and explained why he relied on the opinions of Drs. Link and Larsen—sources which the ALJ was entitled to rely so long as he supported his position with substantial evidence (even if Evans disagrees with the ultimate conclusion reached). 20 C.F.R. § 404.1527(f)(2)(i).

However, Evans argues that the reviewing state agents did not have Mr. Nott's subsequent March 25, 2008 report for their review when they rendered their opinions. However, Mr. Nott's medical records do not provide significant substantive evidence regarding Evans' medical impairments such that any medical opinion rendered without taking them into consideration would be incomplete or ineffective. *See Staggs v. Astrue*, 781 F.Supp.2d 790, 794-95 (S.D. Ind. 2011). As mentioned, the ALJ afforded no weight to Mr. Nott's conclusions—a decision that the Court has found was substantially supported. In addition, Evans does not specifically identify any other medical record which would undermine the state agents' opinions, especially given that the ALJ weighed these opinions and the opinions of other medical sources after consideration of the entire record. *See* 96-6p.

Relative to Dr. Link's assessment in particular, Evans argues that the ALJ should not have relied on the opinion because Dr. Link failed to draw conclusions about Evans' mental functional capacity. Evans looks to 20 C.F.R. § 404.1519n to support her argument.

Considering medical sources, like Dr. Link, who perform consultative examinations, 20 C.F.R. § 404.1519n(b) states that "the detail and format for reporting results . . . will vary depending upon the type of examination or testing requested . . . [and] [t]he medical report must be complete enough to help [the Commissioner] determine the nature, severity, and duration of the impairment, and residual functional capacity."  In addition, the report should reflect a statement of the claimant's symptoms, not simply the medical source's statements or conclusions, and it should include the objective medical facts as well as observations and opinions. *Id.* Further, 20 C.F.R. § 404.1519n(c) indicates that a complete consultative examination should include the following elements: (1) the claimant's major or chief complaints; (2) a detailed description, within the area of specialty of the examination, of the history of the claimant's major complaints; (3) a description, and disposition, of pertinent "positive" and "negative" detailed findings based on the history, examination and laboratory tests related to the major complaints; (4) the results of laboratory and other tests; (5) the diagnosis and prognosis for the claimant's impairments; (6) a statement about what the claimant can still do despite her impairments; and (7) an explanation or comment on, the claimant's major complaints and any other abnormalities found during the history and examination or reported from the laboratory tests. § 404.1519n(c).

Evans position is without merit because Evans was referred to Dr. Link for a mental status evaluation (Tr. 262), and Dr. Link specifically noted that she performed a clinical interview of Evans, a review of Evans' records, and a mental status examination. *Id.*  Even though Dr. Link's

report included all of the above regulatory elements (Tr. 262-66), it appears that Evans believes that Dr. Link's report was incomplete for not providing a sufficient statement about what Evans was capable of doing (element 6). The Court does not agree with Evans.

It is true that the regulations specify that in cases of mental impairments the statement should describe the medical source's opinion about the claimant's ability, despite impairments, to do work-related activities, such as the claimant's ability to understand, to carry out and remember instructions, and to respond appropriately to supervision, coworkers and work pressures in a work setting. § 404.1519n(c). In this case, Dr. Link specifically reported Evans' ability to carry out several tasks relative to her compliance, memory, and ability to understand, and Dr. Link noted that Evans' speech was clear and direct, her thought content was concrete, and her concentration was poor, but she was able to complete all tasks. Dr. Link identified Evans' diagnoses, assigned Evans a GAF of 60, and found that Evans "is considered to be moderately impaired in terms of work related activities in respect to her overall level of functioning." As such, the Court concludes that Dr. Link's report satisfied the regulatory requirements.

Even if it had not, the absence of such a statement in a consultative examination report does not make the report incomplete, § 404.1519n(c); instead, the report is to be considered and weighed according to § 404.1527. Thus, contrary to Evans' suggestion, an ALJ is not required to consult a medical expert, nor does the language of the regulation mandate that the ALJ obtain such a medical source statement regarding the claimant's functional capacity. In reality, the ALJ is required to consider a statement made by a medical source, if one is made. 20 C.F.R. § 404.1545(a)(3).

The Court recognizes that an ALJ has a duty to make a complete record, but this requirement can reasonably require only so much. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). In determining whether an ALJ has sufficiently developed the administrative record, courts "accept reasonable assessments by administrative officials about how much evidence is enough." *See Kendrick v. Shalala*, 998 F.2d 455, 457 (7th Cir. 1993) ("[I]t is always possible to do more. How much evidence to gather is a subject on which district courts must respect the [Commissioner's] reasoned judgment."). "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994). In this case, the ALJ determined that the evidence was adequate for his analysis and acted within his discretion in deciding not to request additional information to make his disability determination.

Evans also contends that Dr. Larsen's opinion was flawed because it is "riddled with contradictions" and therefore it was inappropriate for the ALJ to give Dr. Larsen's opinion more weight than Mr. Nott's opinion. [DE 14 at 17]. Evans' arguments are frivolous, and the Court details each argument in turn.

Evans argues that it was error for Dr. Larsen to find that Evans was "not significantly limited" in her ability to travel. But there is a difference between having "no evidence of limitation" versus "not being significantly limited." Dr. Larsen explicitly noted that Evans has a fear of driving, but in fact she does drive and receives rides from others. (Tr. 269). Therefore, Dr. Larsen considered Evan's limitation with traveling, and resolved that it was not a significant limitation.

Next, Evans argues that Dr. Larsen did not address Evans' fear of interacting with the public. But Dr. Larsen explicitly noted that Evans was moderately limited in her ability to interact with the public, has a fear of doing social things, and has distanced herself from others, and therefore, Dr. Larsen concluded that Evans would benefit from a job that allowed her to function independent from crowds. (Tr. 268-69).

Evans next argues that after acknowledging that Evans' attention and concentration were poor, Dr. Larsen contradicted herself by finding that Evans was not significantly limited with regards to sustained concentration and persistence. But Evans inappropriately dissects the category of "sustained concentration and persistence" as it appears on the mental RFC assessment form, and fails to acknowledge that Dr. Larsen ranked Evans as being moderately limited in several areas that concerned her ability to maintain attention and concentration for extended periods. (Tr. 267). Further, Dr. Larsen opined that although Evans' attention and concentration were poor, she was able to complete all tasks, perform simple calculations within normal limits, perform simple routine tasks at home, and she had the ability to perform simple routine tasks on an extended basis without special consideration. (Tr. 269).

Lastly, Evans argues that Dr. Larsen, and thus the ALJ, impermissibly made a finding of non-disability based on Evans' ability to perform simple routine tasks at home. But the law relied upon by Evans does not state that daily activities cannot be considered by reviewing state agents and ALJ's, instead the law cautions not to put "undue weight on a clamant's household activities in assessing the claimant's ability to hold a job outside the home," *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006), and to consider whether work is done under special circumstances. 20 C.F.R. § 404.1573(c). *See also Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (ALJ

failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week); *Rousey v. Heckler*, 771 F.2d 1065, 1070-71 (7th Cir. 1985) (ALJ did not reject the credibility of the claimant's statements that she must rest between activities or the medical diagnoses which indicated that she could not engage in much productive activity). In this case, the ALJ summarized the testimony about Evans' daily activities, the fact that she gets anxious and nervous around people and when driving, but she still drives when necessary, the fact that she cannot concentrate for long, maintain a fast pace of work, or finish tasks around the house sometimes due to pain, and her stated limitations relative to her memory, lifting, walking, standing, and sitting. *See* 20 C.F.R. § 404.1573(c). But then, as previously discussed in this Order, the ALJ discounted Evans' testimony based on the objective medical evidence, the opinions of her examining doctors who specifically opined that it was unlikely that she was in as much pain as she alleged, and Evans' admitted range of activities which included driving, taking care of and home-schooling her daughter, and visiting with family. Therefore, even though the ALJ relied on Dr. Larsen's opinion who also considered Evans' daily activities, the ALJ did not fail to consider the difference between Evans' ability to engage in daily activities and her being able to work eight hours a day five consecutive days of the week. *See Carradine*, 360 F.3d at 755-56. Rather, the ALJ considered Evans' daily activities and Dr. Larsen's opinion along with the relevant record evidence in making the disability determination. As a result, the ALJ's decision is supported by the substantial evidence.

In the end, even if not an "acceptable medical source," Dr. Larsen gave her opinion based on a review of the file, and the ALJ was required to consider Dr. Larsen's opinion and decide the

weight to be afforded it, which he sufficiently did. *See* 20 C.F.R.§ 404.1527(d); SSR 06-03p.

What Evans proposes is for the Court to reweigh this evidence and substitute the Court's own

judgment for that of the Commissioner, which the Court cannot and will not do. *See Lopez ex rel.*

*Lopez,* 336 F.3d at 539.

Ultimately, determining the residual functional capacity, an issue to be further discussed

herein, is an administrative decision based upon all of the relevant evidence in the record,

including the medical source evidence. 20 C.F.R. § 404.1527(e); SSR 96-5p.  And in this case,

the record contained sufficient evidence from which the ALJ could determine Evans' mental and

physical functioning during the relevant time period: Evans' reports of her impairments,

treatment, and activities; her husband's testimony; Evans' medical records; reviewing state agent

opinions; and, Dr. Link's detailed consultative report which included her findings during a mental

status exam, information about plaintiff's complaints, daily tasks, and behaviors, and the results

of the testing, which showed that Evans was exhibiting moderate symptoms.  The ALJ has

sufficiently developed the administrative record and his determinations to afford various weights

to the various medical sources are supported with substantial evidence.

## C.      ALJ's RFC Determination

Evans asserts that the ALJ failed to consider all of Evans' physical and mental

impairments when making the RFC determination. In particular, Evans believes that the ALJ

failed to appropriately consider the effects of her obesity, Fibromyalgia, and combined mental

limitations.

The ALJ must determine the claimant's RFC before performing steps four or five. *Young*

*v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8p.

RFC is an assessment of the work-related activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of impairments. *Id*. This finding must be assessed based on all the relevant evidence in the record. 20 C.F.R. § 404.1545(a). The ALJ must consider all medically determinable impairments, even if not considered "severe," 20 C.F.R. § 404.1545(a)(2), and the RFC must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000).

The ALJ has final responsibility for deciding a claimant's RFC, which is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1546(c), 404.1527(e). A reviewing court is not to substitute its own opinion for that of the ALJ's or to reweigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez ex rel. Lopez*, 336 F.3d at 539. Further, an ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Nevertheless, an ALJ need not provide a written evaluation of every piece of testimony and evidence. *Golembiewski*, 322 F.3d at 917. Instead, an ALJ need only minimally articulate his justification for accepting or rejecting specific evidence of disability, *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004), and he is required to determine which treating and examining doctors opinions should receive weight and must explain the reasons for these findings. 20 C.F.R. §§ 404.1527(d), (f).

In formulating the RFC, the ALJ discussed the physical and mental ailments documented by Evans' medical history and reported by Evans and her husband. Relative to her physical impairments, the ALJ noted that Evans complained of pain in her back, arthritis in her knees, neck and shoulder problems, and muscle and joint pain caused by Fibromyalgia. The ALJ also noted that Evans has complained of irregular heartbeats and shortness of breath, but these symptoms were thought to be primarily related to her anxiety problems. The ALJ reviewed the record evidence and included a thorough analysis of medical source opinions and the weight to be given to those opinions. (Tr. 16-17; 20-21). *See supra*. The reviewing state agent concluded that none of Evans' physical impairments were severe, to which the ALJ agreed (Tr. 21). The ALJ discounted the opinion of Mr. Lee who would have provided for further limitations in Evans' RFC, and the ALJ ultimately concluded that based on his review of the record, no physical impairments required exertional limits to be placed in her RFC. *Id*.

*Fibromyalgia*

Evans argues that the ALJ failed to consider the effects of her Fibromyalgia when reaching his RFC determination. The Commissioner supports the ALJ's decision by stating that the "trigger point test" reflected in the medical records was not legible and did not err in its exclusion.

The objective medical evidence makes no reference to Evans' Fibromyalgia until over a year and a half after Evans alleges her disability began—Dr. Kelly diagnosed Evans with Fibromyalgia on September 25, 2008. (Tr. 391). Nevertheless, the ALJ generously found that even if Evans' Fibromyalgia was a severe impairment, Evans failed to establish that the condition met the duration requirement, consistent with 20 C.F.R. § 404.1509. Evans does not contest this

finding.  Instead, Evans believes that the ALJ failed to consider her Fibromyalgia and how it limited her ability to function when crafting the RFC.

The ALJ discounted Evans' limiting effects caused by Fibromyalgia for various reasons. Although the ALJ erroneously stated that Dr. Kelly did not document the presence of the proper number of trigger points, the ALJ correctly noted that Dr. Kelly failed to document the diagnosis with the characteristic locations of the trigger points, sleep disturbance, fatigue, exposure to Guilliume-Barre virus, or other diagnostic factors.  The ALJ also noted that Dr. Kelly provided no description about the nature of Evans' Fibromyalgia. Further, despite being the only source to mention Fibromyalgia, Dr. Kelly was not a Rheumatologist or other specialist in autoimmune disorders.  Moreover, the ALJ noted that Dr. Kelly did not explain whether he considered other causes of Evans' pain. Given that Evans had just been in an automobile accident in August 2008, after which she complained of neck pain (for the first time) and back pain, the ALJ's documentation of this fact is reasonable.  The ALJ did not ignore the line of evidence relative to Evans' Fibromyalgia diagnosis; instead, the ALJ articulated his reasons for rejecting Fibromyalgia as a functionally limiting impairment beyond the limitations already considered, which included Evans' complaints of pain and arthritis.

Moreover, Evans has failed to explain the need for any further limitations because of her Fibromyalgia.  The September 2008 diagnosis of Fibromyalgia, which is the only actual diagnosis of Fibromyalgia based on the requisite number of tender points in undocumented locations, does not suggest that any further limitations are caused by Fibromyalgia.  Based on the lack of evidence that Evans' Fibromyalgia caused additional limitation, the Court concludes that the ALJ's decision concerning Evans' Fibromyalgia is supported by substantial evidence.

*Obesity*

Evans asserts that the ALJ did not consider the limiting effects of her obesity for purposes of the RFC determination.

According to SSR 02-1p, an ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity as an impairment. *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006) (citing *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000)). But a failure to explicitly consider the effects of obesity may be harmless error. *Id.*

In *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004), the ALJ did not address the claimant's obesity but did adopt "the limitations suggested by the specialists and reviewing doctors" who were aware of the condition. That, combined with the claimant's failure to "specify how his obesity further impaired his ability to work," made the error harmless: "although the ALJ did not explicitly consider [the claimant's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions." *Skarbek*, 390 F.3d at 504.

Similarly, in *Prochaska*, the ALJ did not explicitly address the claimant's obesity, but the ALJ specifically predicated his decision upon the opinions of physicians who did discuss her weight, and a number of other medical reports relied upon by the ALJ noted her height and weight. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006). No medical opinion in the record identified Prochaska's obesity as significantly aggravating her back injury or contributing to her physical limitations. *Id.* at 737. Prochaska also failed to point to any other evidence suggesting that her obesity exacerbated her physical impairments. *Id.* The Seventh Circuit held that because Prochaska failed to "specify how [her] obesity further impaired [her] ability to

work," and because the record relied upon by the ALJ sufficiently analyzed her obesity, any error on the ALJ's part was harmless. *Id*.

Evans did not specifically claim obesity as an impairment. However, the records reflect that Evans' body weight fluctuated, for instance in July 2003 she weighed 139 pounds (Tr. 324), in February 2007 she weighed 185 pounds (Tr. 245), in January 2008 she weighed 143 pounds (Tr. 301), in August of 2008 she weighed 182 pounds (Tr. 361), and at the time of the hearing she told the ALJ that she weighed 174 pounds (Tr. 35). Thus, the ALJ specifically inquired about Evans' weight and there were multiple references to Evans' height and weight in the records which the ALJ relied on in making his decision. In fact, the ALJ even relied on medical records which reflected that Evans was directed to lose weight in September 2007 and January 2008. Therefore, similar to the circumstances of *Skarbek* and *Prochaska*, although the ALJ did not explicitly mention Evans' obesity, it was factored indirectly into the ALJ's decision as part of the medical records and medical opinions upon which the ALJ relied.

In addition, Evans acknowledges that her body mass index would only be at the lowest of the three levels of obesity that the Commissioner recognizes. SSR 02-1p. Although the medical opinions of record considered Evans' weight, no medical opinion in the record identified Evans' obesity as significantly aggravating or contributing to her physical limitations beyond the pain and other limitations already considered by the ALJ. And other than making the conclusory allegation that obesity can aggravate other impairments [DE 14 at 19, 25; DE 17 at 9], Evans does not articulate how obesity exacerbated her underlying conditions, played any significant role in her alleged inability to work, or would have changed the ALJ's five-step analysis. Any remand

for consideration of Evans' obesity would not change the outcome of this case.  According, the ALJ's failure to explicitly address it does not require remand.

*Social Functioning/Concentration/Persistence/Pace*

Relative to her mental impairments, the ALJ explicitly noted his consideration of Evans' severe impairments of generalized anxiety disorder, panic disorder with agoraphobia, and social phobia, along with her documented complaints of depression and possible post traumatic stress disorder (Tr. 16, 18-19).

However, Evans argues that the ALJ failed to accommodate her difficulties with social functioning and her moderate limitations in concentration, persistence, or pace. [DE 14 at 17-18; DE 17 at 9]. In support of her argument, Evans cites to *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010).

Based on Evans' argument, the Court considers whether the ALJ accurately accounted for her limitations in the RFC, and then whether the relevant limitations were subsequently recounted in the hypothetical posed to the VE at steps 4 and 5.

In *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008), the ALJ failed to indicate what weight he gave to relevant mental medical evidence and therefore there was no way to discern whether the ALJ actually found the claimant to have certain limitations and abilities. 539 F.3d at 676-78.  As a result, the Seventh Circuit held that the ALJ failed to build an accurate and logical bridge between the ALJ's recitation of the mental medical evidence and the decision to account for the claimant's mental impairments in the RFC. *Id.*  Merely limiting the RFC to simple, unskilled work did not account for Craft's documented mental limitations, including her difficulties with memory, mood swings, and limitations in social functioning and concentration, persistence, and pace. *Id.*

In *Young v. Barnhart*, 362 F.3d 995 (7th Cir. 2004), the Seventh Circuit held that restricting the RFC to "simple, routine, repetitive, low stress work with limited contact with coworkers and limited contact with the public" failed to adequately account for all medical limitations, including Young's impairment in concentration, and limitations in temperament and social judgment, including accepting instruction, responding appropriately to criticism from supervisors, thinking independently, and setting realistic goals. *Young*, 362 F.3d at 1002-04. The Seventh Circuit reasoned that although the ALJ may have meant to capture all of the claimant's problems within the RFC, he failed to build the "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Id.* at 1002.

These cases are distinguishable from the present case. In this case, after adequately discrediting Evans' testimony and discussing the relevant medical evidence and weight afforded to the medical sources (as previously detailed in this Order), the ALJ specifically explained the credible mental limitations that Evans suffered and how those limitations were accounted for in his RFC finding. Specifically, the ALJ found that Evans had only mild restrictions in her activities of daily living, and she was able to care for herself, care for her child, and drive and shop when necessary. The ALJ determined that Evans had moderate difficulties with social functioning, as she gets nervous around people and has a fear of driving, but still leaves the home and talks to family on a daily basis. The ALJ found that Evans had moderate difficulties with regard to concentration, persistence, or pace, noting that she is forgetful, feels depressed and stressed and cannot concentrate for a long time or maintain a fast pace of work, although she was able to complete tasks. The ALJ relied on the consultative psychological examiner's conclusion

that Evans had a GAF score of 60, and relied on the state agents who indicated that Evans needs to avoid being around people, but she can do simple repetitive tasks. Thereafter, the ALJ explicitly indicated that he was accounting for the credible limitations in Evans' RFC:

> [T]he claimant has some moderate difficulty with dealing with social functioning and moderate difficulty in sustaining concentration, persistence, or pace. To accommodate these problems, the claimant is limited to simple tasks that allows for flexible work pace and there are no strict production requirements to increase her stress. This allows some ability to get back on task as needed throughout the day. Further, the claimant's contact with others is limited both in length and intensity. However, the claimant is not completely unable to function outside the area of her home. . .

> . . .The moderate limits in the B criteria have been accommodated in the residual functional capacity by limiting the frequency and intensity of contacts with others. Further, the claimant is limited to simple work that gives her some flexibility in pace to accommodate her concentration limitations.

(Tr. 21-22).

Thus, unlike the circumstances in *Craft* and *Young*, the ALJ built an accurate and logical bridge by first weighing the mental medical evidence and determining the degree to which the ALJ believed Evans was limited mentally. Then, the ALJ explained exactly how he was accounting for each of her mental limitations in the RFC. Relative to Evans' limitations in memory, concentration, persistence, and pace, the ALJ explained that an unskilled work designation further limited by simple routine tasks, and further restricted by a required flexible work pace with no fast paced or production requirements, would account for her moderate difficulties with sustaining concentration, persistence, or pace. Relative to Evans' anxiety of being around people, the ALJ explained that Evans' work would be restricted to no work with the

general public, only cursory routine interactions with supervisors or coworkers, and work that can be accomplished alone or in a small group.

Moreover, in this case, the ALJ's RFC determination was consistent with the opinions of Drs. Link, Larsen, Brill, and Neville. The ALJ was entitled to rely upon their opinions. 20 C.F.R. § 404.1527(f)(2)(i).  More importantly, there is no doctor's opinion, acceptable medical source opinion, or other (credible) source opinion contained in the record which indicated greater limitations than those found by the ALJ. *See Denton v. Astrue,* 596 F.3d 419, 426 (7th Cir. 2010) (citing *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994) (noting that the claimant "must furnish medical and other evidence that the ALJ can use to reach conclusions about his medical impairment and its effect on his ability to work on a sustained basis.")).

Ultimately, the Court holds that the ALJ's RFC assessment was based on all of the relevant evidence in the record, and included an evaluation on both the evidence favoring the finding of disability, as well as the evidence favoring the claim's rejection. 20 C.F.R. § 404.1545(a).  Further, the ALJ properly considered all of Evans' medically determinable impairments, even if not considered "severe." 20 C.F.R. § 404.1545(a)(2).  Because the ALJ effectively translated the record evidence regarding Evans' limitations into an RFC assessment, the Court finds that the ALJ's RFC finding is supported by substantial evidence in the record.

### D.      Steps Four and Five

At step four, the ALJ decided that Evans cannot perform her past work, based on the VE's testimony which indicated that she could not maintain the pace requirements. (Tr. 23, 88).  Thus, the question became whether Evans had the capability of performing other work in the national economy. *Tom v. Heckler*, 779 F.2d 1250, 1253 (7th Cir. 1985); 20 C.F.R. § 404.1520(g).

Evans asserts that the ALJ's step five determination is not supported by substantial evidence because the VE's testimony was based on an inaccurate hypothetical, and because the ALJ failed to consider that there are no jobs permitting absolutely no contact with the public.

Relative to the hypothetical question posed to the VE, this case is unlike the situation in *O'Connor-Spinner*. In *O'Connor-Spinner*, the most restrictive hypothetical question posed by the ALJ to the VE included a restriction of routine, repetitive tasks with simple instructions, but it did not include "a limitation on concentration, persistence or pace, although later in his written decision the ALJ listed this limitation in assessing Ms. O'Connor–Spinner's residual functional capacity." *O'Connor-Spinner v. Astrue*, 627 F.3d at 617-18. Neither did the ALJ include any limitation on receiving instruction and responding appropriately to supervisors. *Id*. at 618.

In this case, the least restrictive hypothetical question posed by the ALJ to the VE was entirely consistent with the ALJ's RFC finding, *compare* Tr. 87-88 *with* Tr. 19, which included complexity, pace, and production restrictions, along with restricted interactions with the public, supervisors, and co-workers. Because the ALJ used the exact RFC finding in his first hypothetical posed to the VE, the Court finds that the hypothetical accurately reflected Evans' RFC, which permitted the VE to testify to the jobs that Evans could perform based on all of her limitations. Because the VE was properly oriented to the totality of Evans' limitations (as reflected in the RFC and resulting hypothetical question) and was permitted to include the limitations in his response to the hypothetical, the Court concludes that there is no basis for a remand.

Relative to Evans' argument that no jobs permit absolutely no contact with the public, Evans does not accurately portray the limitations that the ALJ placed in the hypothetical given to

the VE or placed in his ultimate RFC determination. Both the hypothetical and the RFC included a limitation that Evans could not "*work with* the general public" (Tr. 19, 87), not "no contact" with others. The substantial evidence supports the ALJ's determination that Evans was unable to work in large groups, with the general public, or with prolonged interaction with supervisors or coworkers.

Moreover, the VE testified that given the hypothetical (which was based on the ALJ's ultimate RFC finding), Evans could perform the representative occupations of dining room attendant, industrial cleaner, and dishwasher. The VE further testified that based on the medium exertional level and the limitations posed in the hypothetical, the following number of jobs existed: at the regional level there were 800 dining room attendant jobs available, 1,100 dishwasher jobs available, and 700 industrial cleaner jobs available; at the state level there were 9,250 dining room attendant jobs available, 9,910 dishwasher jobs available, and 7,000 industrial cleaner jobs available; and, at the national level there were 431,000 dining room attendant jobs available, 525,000 dishwasher jobs available, and 200,000 to 300,000 industrial clearer jobs available. The VE also confirmed that her testimony in this respect was consistent with the Dictionary of Occupation Titles. No discrepancy was raised in relation to this testimony. Therefore, the ALJ complied with the requirements of SSR 00–4p, which places an affirmative duty on an ALJ to inquire as to whether a vocational expert's testimony is consistent with the Dictionary of Occupation Titles. *See Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006).

As stated above, the VE was properly oriented to the totality of Evans' limitations and the VE was permitted to include the limitations when testifying. The ALJ did not error when he agreed with the VE's testimony which was consistent with the DOT, and the Court finds that the

ALJ fully complied with the requirements of SSR 00–4p.  Accordingly, the ALJ's finding that

Evans was able to perform a significant number of jobs in the national economy is supported by

substantial evidence.

## V. Conclusion

For the aforementioned reasons, Evans' motion for remand is DENIED. [DE 1].

Accordingly, the Commissioner's decision will be AFFIRMED.  The Clerk is DIRECTED to

enter judgment in favor of the Commissioner and against Ms. Rachel Evans.

SO ORDERED.

ENTERED:  March 20, 2012

            /s/ JON E. DEGUILIO
Judge
United States District Court